# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

CARDIOVASCULAR AND THORACIC
SURGEONS, INC.,

      Plaintiff,

vs.

ST. ELIZABETH MEDICAL CENTER, INC.,
a.k.a. St. Elizabeth Medical Center and
St. Elizabeth Healthcare,

      Defendant.

Case No. 1:10-cv-846

Judge Timothy S. Black

**ORDER THAT PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. 52) IS GRANTED IN PART AND DENIED IN PART AND THAT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 53) IS GRANTED IN PART AND DENIED IN PART**

This civil action is before the Court on the parties' cross-motions for partial summary judgment (Docs. 52 and 53) and responsive memoranda (Docs. 55, 56, 59, and 60).

## I. BACKGROUND

### A. Undisputed Facts

St. Luke Hospitals, Inc. ("St. Luke") sought to establish an open heart surgery program in Northern Kentucky for several years. (Doc. 52, Ex. 1 at 5). Under Kentucky law, a Certificate of Need must be obtained before a new healthcare facility can open. *See* Ky. Rev. Stat. Ann.§ 216B.040. The Kentucky Cabinet for Health and Family Services issued the Certificate of Need in the fall of 2006, and St. Luke moved forward with its plans. (Doc. 52, Ex. 7).

St. Luke entered into a contract with Plaintiff Cardiovascular and Thoracic Surgeons, Inc. ("CVTS") on June 27, 2007 to provide professional administrative, coverage, and clinical services. (Doc. 53, Appx. A). The contract ran from June 27, 2007 through July 31, 2010. (*Id*. at § 2). Under the terms of the agreement, CVTS would provide designated physicians for the full-time positions of Medical Director, Cardiac Surgeon, and On Call Surgery Physician for St. Luke. (*Id*. at Ex. A, Att. 1). In exchange, CVTS would receive $66,666.67 per month in revenue. (*Id*. at Ex. A, Att. 2, § 2.1)

CVTS recruited Dr. Alain Asher in August 2007 to serve as the full time Medical Director and Cardiac Surgeon as provided for in the agreement. (Doc. 52, Ex. 1 at 7). In June 2008, Dr. Asher resigned and CVTS designated Dr. Manisha Patel as his replacement. (*Id*.) St. Luke continued to make timely payments to CVTS. (*Id*.).

Meanwhile, St. Elizabeth Medical Center, a competitor to St. Luke and a provider of open heart surgery services in Northern Kentucky, opposed St. Luke's efforts to establish an open heart surgery program. St. Elizabeth challenged St. Luke's application for the Certificate of Need, and on June 1, 2007 successfully obtained an order from the Franklin Circuit Court reversing the Final Order of the Cabinet awarding the Certificate of Need to St. Luke. (Doc. 53, Appx. E). On August 15, 2007, the Franklin Circuit Court issued a permanent injunction prohibiting the Cabinet from issuing a Certificate of Need for St. Luke's proposed open heart surgery program and effectively precluding St. Luke's program from operating. (*Id*. at 24). St. Luke appealed.

In October 27, 2008, St. Elizabeth merged with St. Luke and became St. Elizabeth Medical Center, Inc. ("SEMC"). After the merger, SEMC dismissed the pending appeal of the Franklin Circuit Court's decision.[1] (Doc. 52, Ex. 4A at 3). As a result, the Cabinet revoked St. Luke's Certificate of Need on July 16, 2009. (*Id*.).

After the merger, SEMC continued the monthly payments to CVTS through November 2008. (Doc. 53, Appx. H). SEMC failed to make the monthly payments for December 2008, January 2009, and February 2009. (*Id*.). In February 2009, SEMC advised CVTS that it believed that the monthly payments were in violation of federal law. (Doc. 53, Appx. L). SEMC informed CVTS that it would cease the monthly payments and seek reimbursement of all payments made between November 2009 through January 2009). (*Id.*).

**B.     Procedural History**

CVTS filed suit against SEMC on December 1, 2010, alleging claims for (1) breach of contract; (2) unjust enrichment; and (3) promissory estoppel. (Doc. 1 at ¶¶ 33-51). Plaintiffs seek damages totaling $1,563,870, plus interest, costs, and attorneys fees. (*Id*. at 9).

SEMC subsequently filed a counterclaim, seeking reimbursement of the $309,070.55 in monthly fees paid from June 2008 to June 2009 for the services of Dr. Manisha Patel. (Doc. 50 at ¶¶ 1-28).

---

[1] As a result of the merger, SEMC was effectively both the plaintiff and the defendant in the appeal.

On March 8, the parties filed cross Motions for Partial Summary Judgment (Docs. 52 and 53). On April 5, Defendant filed a Motion to Strike Plaintiff's Summary Judgment Declarations (Doc. 58). The parties have filed their responsive memoranda (Docs. 55, 56, 59, 60, 61, and 62), and the Court heard oral argument on May 22, 2012.

## II.     ANALYSIS

### A.     The Motion to Strike

SEMC is seeking to strike the declarations offered by Plaintiff in support of its Motion for Summary Judgment. Specifically, Defendant seeks to strike the declarations of Nancy Barone, Dr. S. Russell Vesters, and Katheryn Cook (Exs. 1, 2, and 3 to Doc. 19). SEMC argues that all three declarations include irrelevant and misleading assertions, opinions that are not within the knowledge of lay witnesses, and violate the Best Evidence Rule. (Doc. 58-1 at 3).

#### 1.     Legal Standard

Federal Rule of Civil Procedure 56(c)(4) states that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Because the information contained in the affidavits must be admissible at trial, they must also comply with the Federal Rules of Evidence.

2. Analysis

a. Relevance

Under Federal Rule of Evidence 402, only relevant evidence is admissible. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and if the fact "is of consequence in determining the action." Fed. R. Evid. 401. Defendant objects to any statements in the declarations which reference St. Luke's investment in the proposed program or Dr. Vester's activities to support the program. In Defendant's view, the acts taken are irrelevant to the legal determination of whether any payment from SEMC to CVTS for its "willingness" to perform services violates the Stark Law. (Doc. 58-1 at 5).

The Court disagrees. The central inquiry under the Stark Law is whether the payments were fair market value, and background information on the undertakings of each party is highly relevant to a determination as to whether the payments constituted fair market value.

b. Opinion Testimony

Defendant also argues that the declarations contain improper opinions as to the compensation provided for in the contract. (Doc. 58-1 at 5). Under the Federal Rules of Evidence, a lay witness may not testify on "scientific, technical, or other specialized knowledge." Fed. R. Civ. P. 701(c). SEMC asserts that statements by Barone, Vester, and Cook that the compensation offered was fair market value are impermissible because they offer technical expert conclusions. (Doc. 58-1 at 6).

The Court finds that these statements are not expert opinions. The declarations of Barone, Cook, and Vester reveal the intent of the parties at the time of the agreement. Further, the Court finds that whether or not the price in the contract was fair market value for the services rendered is within the specialized skill and knowledge of St. Luke's CEO.

### c. Best Evidence Rule

Finally, Defendant objects to the admissibility of the declarations on the grounds that they are being offered to establish the substantive content of writings without attaching the original writings. (Doc. 58-1 at 3). Federal Rule of Evidence 1002 - the so-called "Best Evidence Rule" - states that "An original writing, recording or photograph is required to prove its contents unless these rules or a federal statute provide otherwise." In each declaration, Barone, Vester, and Cook assert that compensation to CVTS was based upon "pro forma studies" and that "comparable agreements were taken into account" in setting compensation. (Doc. 52, Ex. 2. at ¶ 6, Doc. 52, Ex. 3. at ¶ 8, and Doc. 52, Ex. 4. at ¶ 6). Although Defendant asserts that Plaintiff is using these declarations to "prove the content of the various underlying data," the Court disagrees. The declarations are being offered to demonstrate only that the parties had access to this data and used this data to inform their decision making process. Such use does not violate the Best Evidence Rule.

### B. The Motions for Summary Judgment

Plaintiff CVTS has filed a Motion for Partial Summary Judgment (Doc. 52) on its claims for breach of contract. Defendant SEMC has also filed a Motion for Summary Judgment (Doc. 53) on the breach of contract claim. Both motions are now fully briefed and ripe for review. (See Docs. 54, 56, 59, and 60).

#### 1. Legal Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

2. **Analysis**

The parties' motions focus on four key issues: (1) whether St. Luke was obligated to pay CVTS for its willingness to provide services, or only for actual services provided; (2) whether either party breached the contract; (3) whether the contract violates public policy as embodied in the Stark Law, 42 U.S.C. § 1395; and (4) whether SEMC properly terminated the agreement in accordance with the terms.

a. **St. Luke's Obligation to Compensate CVTS**

The first issue in dispute is whether the terms of the contract required SEMC to compensate CVTS in light of the fact that the surgical program was abandoned. Defendant argues that the agreement provides that CVTS would receive $66,667 per month in exchange for the provision of Open Heart Surgical Services; and in Defendant's view, from June 2009 to July 2010, CVTS did not provide any surgical services and SEMC was therefore not obligated to pay.[2] (Doc. 53-1 at 17). While Plaintiff does not dispute that the open heart program was abandoned, it argues that the contract required SEMC to compensate CVTS for its "willingness" to perform the surgery. (Doc. 55 at 11).

The terms of the contract are governed by Kentucky law. (Doc. 53, Ex. A Sec. 12(m)). Courts must interpret a contract's terms "by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. PTA Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Further, an interpretation of a contract that "gives a reasonable,

---

[2] Defendant does not dispute the payments for the period in which Dr. Asher was the designated physician.

-8-

lawful, and effective meaning to all the terms is preferred over an interpretation which leaves a part unreasonable, unlawful, or of no effect." *L.K. Comstock & Co., Inc. v. Becon Construction Co.*, 932 F. Supp. 948, 967 (E.D. Ky. 1994) (citing *Restatement (Second) of Contracts* § 203(a) (1979)).

Section 2.1 of the contract states that CVTS will receive $66,667 per month "[i]n exchange for the willingness of Contractor to provide the Open Heart Surgical Services that can be provided by the Cardiac Surgeon at Hospital." (Doc. 53, Ex. A at 2.1). Despite this language, Defendant argues that the contract as a whole demonstrates a requirement of payment only for actual services rendered, rather than CVTS's "mere willingness" to perform. (Doc. 53-1 at 18). To support this view, SEMC relies primarily on Sections 1(a), which states that "Contractor hereby agrees to provide, one or more Designated Physicians to render the professional administrative, coverage and clinical services as described in this Agreement," and Section 3(a), which states that "Contractor shall perform, through its Designated Physician(s), the Contractor Services in accordance with all of the terms and conditions in this Agreement, including those set forth on Exhibit A . . . . Contractor shall cause each Designated Physician to devote a sufficient amount of time each year to meet the continuing medical education requirement necessary to maintain a license to practice medicine in the state(s) in which such physician provides Contractor Services." (Doc. 53, Ex. A at 1(a) and 3(a)). In Defendant's view, the "willingness" language of Section 2.1 is tempered by the language in Sections 1(a) and

3(a) that requires the physician to "provide service." (Doc. 53-1 at 18).

However, the Court finds that Defendant's interpretation ignores the plain meaning of Sections 2.1 and 4(d). Section 4(d) provides:

> Hospital acknowledges that the ability of Contractor and the Designated Physicians to perform Contractor Services in accordance with the Agreement is contingent upon Hospital's adequate discharge of its responsibilities under this Agreement, and on the satisfaction of all conditions that are beyond the control of Contractor and its Designated Physicians but within the control or responsibility of Hospital. (Doc. 53, Ex. A at 4(d)).

The plain language of the contract states that Plaintiff was entitled to payment for its willingness to perform; there is no provision that the services must actually be rendered. The parties contracted for CVTS to be qualified, available, and on call to administer the open heart surgery program. This conclusion is bolstered by Section 4(d), in which the parties clearly contemplate the possibility that the open heart surgery program may never open. St. Luke could not guarantee CVTS that it would successfully obtain a Certificate of Need to open the program, and therefore provided an income guarantee to ensure CVTS's availability.

Accordingly, the Court finds that the plain meaning of the contract required payment to CVTS regardless of whether the cardiac program opened and actual surgical services were rendered.

### b. Breach of the Contract

Defendant next argues that even if it were obligated under the terms of the contract

to pay CVTS absent the performance of any surgical services, CVTS breached the contract and therefore relieved SEMC of any obligation to pay. (Doc. 53-1 at 22-23). "Failure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach." *Franconia Assoc. V. United States*, 536 U.S. 129, 142-3 (2002); *see also Restatement (Second) of Contracts* § 235(2) (1979) ("When performance of a duty under a contract is due, any non-performance is a breach."). Additionally, a party who first commits a material breach cannot seek enforcement of the contract. *See Fay E. Smas Money Purch Pension Plan v. Jansen*, 3 S.W.3d 753, 759 (Ky. App. 1999); 23 *Williston on Contracts* § 63:3 (4th ed.). In the event of a material breach, "further performance of the other party is excused." *Williston* at § 44:55.

Here, Defendant argues that CVTS breached the agreement because CVTS failed to: (1) maintain a staffed office at St. Luke; (2) maintain time logs; (3) give proper notice of Dr. Asher's departure; and (4) devote Dr. Patel full time to performing services at St. Luke. (Doc. 53-1 at 20-26). The parties do not dispute any of the relevant facts, and, instead, focus their arguments on the legal requirements of the contract.

With respect to the first two issues, it is undisputed that the contract required CVTS to maintain a staffed office, time logs, and support for St. Luke physicians. (*See* Doc. 53, Ex. A at 3(j), 9(a)). However, as discussed above, Section 4(d) of the agreement specifically acknowledges that the ability of CVTS to perform certain services is conditioned upon the Hospital's satisfaction of certain conditions (principally obtaining a

Certificate of Need). (*Id*. at 4(d)). St. Luke and SEMC failed to obtain the Certificate of Need necessary to allow the performance of cardiac surgery, and, further, CVTS was legally enjoined from preparing any services other than preparation for the open heart surgery program. (*See* Doc. 52-1 at 3-4). Under these circumstances, the Court finds that St. Luke and SEMC failed to satisfy the conditions that would have required CVTS's compliance. Without an operative open heart surgery program, CVTS could not see patients, and, accordingly, did not have an office or time logs for such purposes.

SEMC also argues that CVTS materially breached the contract by appointing an unlicensed physician as the Cardiac Surgeon and by failing to give proper notice of Dr. Asher's departure. As an initial matter, Plaintiff has produced evidence that Dr. Asher possessed a valid temporary permit to practice medicine in Kentucky at the time of his appointment and a full license within the required six month period. (Doc. 55, Ex. 1, Ex. A). Additionally, the contract provided St. Luke with a remedy to terminate Dr. Asher if he had failed to remedy the conduct necessary to provide services to the hospital. (*See* Doc. 53, Ex. A at 1(b)). Finally, with respect to Defendant's argument that CVTS breached the contract by failing to provide adequate notice of Dr. Asher's departure, the record shows that Plaintiff complied with the terms set forth in Section 1(b)(ii) to notify the hospital "as soon as reasonably possible" that Dr. Asher would no longer serve as the designated physician. (Doc. 55 at 13).

Lastly, SEMC argues that CVTS committed a material breach of the agreement

when it failed to devote Dr. Patel's full-time services to St. Luke. (Doc. 53-1 at 17). Defendant argues that Dr. Patel's failure to devote "her full time effort, energy, and skill to performing open heart surgery" constituted a breach of the agreement. But this argument simply ignores the fact that Dr. Patel was legally enjoined from performing open heart surgery at St. Luke. As discussed above, the contract required the designated physician to be willing and able to perform open heart surgery when the program was operational. Defendant has provided no evidence that Dr. Patel breached that obligation.

For the reasons stated above, the Court finds that CVTS did not materially breach the contract and thereby excuse performance by SEMC.

      **c.**     **The Stark Law**

Defendant next argues that even if CVTS did not breach the contract, SEMC's performance was excused because the contract is contrary to public policy. (Doc. 53, Ex. 1 at 26). Generally, courts will not enforce a contract that legislation prohibits or whose enforcement will lead to results contrary to public policy. *See Restatement (Second) of Contracts* § 178. Defendant argues that the contract is contrary to public policy, and therefore unenforceable, because it violates the Stark Law, 42 U.S.C § 1395nn.

Generally, the Stark Law aims to prevent Medicare abuse and prohibits illegal physician referrals. Under the law, if a physician has a financial relationship with a hospital, (a) the physician may not make a referral to the hospital for the furnishing of health services and (b) the hospital may not present a claim to Medicare for any services

furnished pursuant to a referral. 42 U.S.C. § 1395nn(a)(1). A direct financial relationship exists where either the hospital pays the physician, or where the hospital pays the practice group (also known as the "stand in the shoes provision" – the doctor stands in the shoes of his practice). 42 C.F.R. § 411.354(a)(2)(I). Here, Defendant argues that there was an illegal direct financial relationship between Dr. Patel and St. Luke because St. Luke paid CVTS which in turn paid Dr. Patel. (Doc. 56 at 10).

However, the Stark law provides an exemption from the stand in the shoes provision for contracts that: (1) were signed prior to September 5, 2007 and (2) meet the indirect compensation exception. Indirect compensation is excepted from the Stark law requirements if: (1) the compensation received by the referring physician is fair market value for services and items actually provided; (2) the compensation is fair market value for the services rendered and is not determined in any manner that takes into account the volume or value of referrals or business generated by the referring physician; (3) the compensation arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; and (4) the compensation arrangement does not violate the anti-kickback statute or any federal or state law or regulation governing billing or claims submission. 42 C.F.R. 411.357(p).

The parties acknowledge that the agreement was signed prior to September 5, 2007; however, they do not agree on whether the contract satisfies the indirect compensation exception. Defendant argues that although the monthly payments were a

flat fee, they exceeded fair market value and therefore must have taken into account the value or volume of referrals. (Doc. 56 at 11). To rebut this allegation, CVTS offers declarations of former St. Luke Vice President of Administrative Services Katheryn Cook and Senior Vice President and CEO Nancy Barone stating that St. Luke officials conducted extensive research, relying on *pro forma* studies and comparable agreements to determine the proper amount of the monthly payments; and based upon this research and their needs, they felt that $66,667 per month was fair market value for the services in the contract. (*See* Doc. 52, Ex. 2 at 2; Doc. 52, Ex. 3 at 3). Additionally, Dr. Asher never referred a single patient to St. Luke, and Dr. Patel referred only one patient during the duration of the contract; and there is no evidence whatsoever that the volume of these referrals affected the value of the monthly payments. (Doc. 52, Ex. 1 at 12).

Defendant's sole support for its argument is a citation to provisions of the Code of Federal Regulations which state that lump sum payments can take into account the volume of referrals. (*Id*. (citing 69 Fed. Reg. 16,060 (March 26, 2004) and 72 Fed. Reg. 51,029 (Sept. 5, 2007)). However, these regulations simply state that lump sum payments *may* take into account the volume of referrals, not that they must be construed to do so. Defendant's argument rests upon circular reasoning: in Defendant's view, the payments exceeded fair market value and must therefore take into account the volume of referrals; and one can conclude that the payments took into account the volume of referrals because the payments exceeded fair market value. Such reasoning does not rebut the evidence

offered by the Plaintiff and persuade the Court that payments under the contract would violate the Stark law.[3]

### d. Termination fo the Agreement

Defendant's final argument is that even if the contract were enforceable and lawful, SEMC validly terminated the agreement in February 2009. (Doc. 53-1 at 32). Section 8(e) of the agreement provides as follows:

> If this Agreement or any activities contemplated herein are deemed by either party, upon the written advice of legal counsel, to be in violation of any lawfully adopted laws, procedures, rules, regulations, or policies of the state(s) in which Contractor Services are being rendered hereunder or a Federal government agency, including but not limited to, the Department of Health and Human Services and the Internal Revenue Service (collectively "Laws"), (I) this Agreement shall, as agreed upon by the parties hereto, be amended so as to comply with the Laws, or (ii) if no such amendment is agreed upon or compliance with Laws is not practicable, either party may terminate this Agreement upon 30 days written notice to the other party.

(Doc. 53, Appx. A at 8(e)).

On February 5, 2009, SEMC Executive Vice President and Chief Operating Officer John Dubis sent a letter to CVTS Chief Operating Officer Kathleen Dooley informing CVTS that SEMC was terminating the agreement due to the legal advice of counsel that the arrangement violated the Stark law.[4] (*See* Doc. 53, Ex. L). CVTS argues that the parties continued to negotiate after receipt of the letter, and that the letter did not

---

[3] This conclusion is bolstered by the fact that St. Luke and SEMC paid the monthly amounts for eighteen months without ever raising a concern that the payments violated the Stark law.

[4] Although the Court concludes that the contract does not violate the Stark law, the contract requires only that a party terminate on the basis of the written legal advice of counsel. There is no requirement that the advice be correct.

-16-

therefore constitute a termination under Section 8(e). (Doc. 52-1 at 20). However, the Court finds the language of the letter clear on its face: "Furthermore, our outside counsel has advised us that the continued relationship with CVTS pursuant to the Agreement is problematic and that it is not practicable to reform the agreement to comply with the applicable law. As a result, we hereby provide notice of termination pursuant to Section 8.e of the Agreement." (Doc. 53, Ex. L).

Accordingly, the Court finds that the Defendant provided proper written notice of termination on February 5, 2009, and that the contract was therefore terminated on March 9, 2009.

## IV. CONCLUSION

Accordingly, for the reasons stated here:

(1) Defendant's Motion to Strike (Doc. 58) is **DENIED**;

(2) Plaintiff's Motion for Partial Summary Judgment (Doc. 52) is **GRANTED IN PART** and **DENIED IN PART** and Defendant's Motion for Summary Judgment (Doc. 53) is **GRANTED IN PART** and **DENIED IN PART**.

Specifically:

(A) The Court finds that the terms of the contract obligated Defendant to make monthly payments to Plaintiff;

(B) Plaintiff did not materially breach the contract;

(C) Enforcement of the contract does not violate the Stark law; and

(D) Defendant provided valid written notice of termination of the contract on February 5, 2009.

(E) Accordingly, Plaintiff is entitled to all payments made or due prior to March 9, 2009. Defendant is not obligated for any payments due after March 9, 2009.

**IT IS SO ORDERED.**


Date: 9/11/12   *s/ Timothy S. Black*
Timothy S. Black
United States District Judge